NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **CHRISTOPHER COSMANO** : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> **COMMISSIONER OF SOCIAL** : <br> **SECURITY,** : <br> : <br> Defendant. : | Civil Action No. 06-cv-2476 (PGS) <br><br> **OPINION** |

**SHERIDAN, U.S.D.J.**

    This action is a timely appeal from a final decision of the Commissioner of Social Security brought by Plaintiff Christopher Cosmano pursuant to 42 U.S.C. §405(g) and 1383(c)(3). Plaintiff had been previously denied benefits and that decision was not appealed by plaintiff, and therefore became the final decision of the Commissioner of Social Security.

    This case is a second application for Disability Insurance Benefits and Supplemental Security Income payments which plaintiff filed on August 18, 2003. The period of disability in dispute here is May 23, 2003 through December 21, 2005. On December 21, 2005, ALJ Friedman found that in this case plaintiff was not disabled during said period of alleged disability. Although plaintiff was represented by an attorney at the hearing before the ALJ, he is now proceeding pro se. As plaintiff is representing himself in this matter, the Court is proceeding in a less stringent manner than the

ordinary litigant, and plaintiff is entitled to liberal construction of the court's rules. *See*, *Bryen v. Becker*, 785 F. Supp. 484, 485 (D.N.J. 1991).

I.

Christopher Cosmano is a 49 year old man with a high school education. He worked as a food handler at restaurants, and more recently as a deli clerk in a supermarket. In addition, he trained as a dental technician in the Navy (1977 - 1980), but has no civilian work experience in this field. He currently lives alone in an apartment in North Bergen, New Jersey. While working as a deli clerk at a supermarket on October 6, 2000, plaintiff's leg was caught between a metal post and a metal table causing him to twist and fall. In the process of falling, he twisted his groin and his right leg causing severe injury and pain to both groins and the right knee. (R. 191). According to plaintiff, he received treatment from a local doctor who diagnosed a sprained knee. Plaintiff apparently complained of a groin bulge, but it was not attended to immediately. On January 17, 2001, he underwent arthroscopic surgery for a torn cartilage in his knee. (R.472). He continued to have groin pain. During his recuperation for knee surgery, another physician, Dr. Caprio, diagnosed him with bilateral inguinal hernias. The hernias were surgically repaired on September 27, 2001 (R. 391, 404). However, according to plaintiff, despite treatment for both his knee and groin injuries, he continues to experience constant severe pain in his right knee, leg and groin.

Since 2001, plaintiff has sought treatment from numerous medical sources for treatment of his constant pain. During this course of treatment, he was diagnosed with osteoarthritis of the right knee and meralgia parasthetica. Meralgia parasthetica is a disorder characterized by tingling, numbness and burning pain in the outer side of the thigh. It is caused by a compression of the lateral femoral cutaneous nerve as it exits the pelvis. He has been taking multiple prescription pain

medications since 2000.  He currently lives in a one bedroom apartment. He has no income other than a  minimal amount of money each month from the State ($474) to help pay his rent and he gets a food stamp card.  (R. 23, 61).  He can walk about a block and a half to the grocery store, but could not estimate how long he was able to stand.  He does minimal housework including his laundry, but has difficulty dressing himself because of his pain.  He does not socialize and passes time watching television.

The Court reviewed numerous medical records and reports[1].

On November 17, 2003, Dr. David Thierston, M.D, a consultative orthopedist, examined plaintiff.  After a review of plaintiff's medical history, plaintiff restated his complaints of constant pain and swelling in his upper and inner right thigh and right groin.  Dr. Thierston observed that "claimant frequently groans in pain and makes a great deal out of moving extremely slowly, stating that all sorts of motions, even motions of the body quite remote from the area of his distress cause exacerbations of his pain. There is a distinct impression that claimant is grossly exaggerating and it is very difficult to objectively assess what is really the case in this evaluation".  (R. 333).   In addition, he noted that plaintiff "uses no assistive device, needs no help changing for the exam or getting on and off the examining table. [He is] able to rise from a chair without difficulty." (R. 333). Dr. Thierston's observations of plaintiff's fine motor activity of his hands were that of grip strength of 3/5 to 4/5 on the right and 5/5 on the left.  Plaintiff had full range of motion in his shoulders, elbows, forearms and wrists bilaterally.  There was no joint inflamation, effusion, or instability. However, Dr. Thierston noted "it is considered impossible to assess strength in the proximal and

---

[1] Although medical records from October, 2000 through January, 2005 are in the Administrative Record and were reviewed by this Court, only the reports relevant to the period of disability (May 24, 2003 through December 21, 2005) are summarized here.

distal muscles due to what appears to be an erratic cooperation or lack thereof and protestations that motions of the upper body cause pain in the groin and knee." There was no muscle atrophy and no sensory abnormality.   He refused to extend or flex his waist because he said it is too painful.  Range of motion of plaintiff's knees and hips could not be tested as he refused to move, but no atrophy of the muscles was evident. Dr. Thierston's recognized plaintiff had a  history of surgery of the right knee, osteoarthritis of the right knee and bilateral inguinal hernia.  His prognosis for plaintiff was guarded, and he found that plaintiff was unable to perform activities requiring prolonged standing, walking, or carrying.

     Plaintiff was also examined by Dr. Colao, a physician who specializes in physical therapy and rehabilitation.  Dr. Colao's diagnosis was meralgia parasthetica, and plaintiff was referred to anesthesiology for a diagnostic and therapeutic block of the lateral femoral cutaneous nerve. Plaintiff refused this treatment because he was being managed quite well on his Percocet, and he did not want to change his regimen of two tablets or three tables a day. (R. 382).  From Dr. Colao's viewpoint, a therapeutic nerve block was the preferred first line treatment, and if that failed then either antidepressants or neuroleptics would be employed to manage his neuropathic pain.

     Dr. Ralf van der Sluis, M.D., attending neurologist at the East Orange, New Jersey Veteran's Administration Clinic, examined plaintiff.  Dr. van der Sluis prescribed Gabapentin, Oxycodone and Percocet for plaintiff's nerve pain.  On May 5, 2005, Dr. van der Sluis noted plaintiff was a "well looking veteran in no acute distress".  His mental status was intact and speech was normal, loquacious.  His notes indicate that plaintiff's medications were increased slightly, and that he continued to complain of severe pain.  The report further indicates that muscle bulk was normal without signs of atrophy on the right side.  Motor strength was limited due to pain, and plaintiff

complained of pain while getting up from the chair and on to the examining table. His right thigh was sensitive to the touch. His gait was normal and his stride and posture were very supple and no longer antalgic[2] (R. 684). Plaintiff's EMG was normal. Dr. van der Sluis's assessment of plaintiff was "chronic pain syndrome, possibly related to anterior femoral nerve compression or posttraumatic neuropathy after hernia repair or after the torsion injury. The Ilio-inguinal nerve also affected." Dr. van der Sluis's 2005 treatment plan was to continue Amitriptyline for pain, increase Gabapentin to 800 mg (three times a day), and continue Percocet/oxycodone for symptomatic pain relief.

Between 2001 and 2005, plaintiff was seen for examinations on request of the Work First New Jersey program as part of his application to defer work requirements under that program. Two of these physicians rated plaintiff as having "functional capacity adequate to perform only little or none of the duties of usual occupation or self care." (R. 362, 368).

From a psychological viewpoint, two psychiatrists found that plaintiff's prognosis was fair, and there was no medically determinable psychological impairment. (R. 337-40 and R. 347-360).

A Physical Residual Functioning Capacity assessment was performed on December 23, 2003. (R. 341). The test revealed that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8 hour day; sit (with normal breaks) for a total of about six hours in an 8 hour day; unlimited push and/or pull (including operation of hand and/or foot controls); and no postural, manipulative, visual, communicative or environmental limitations were noted.

---

[2] Antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain. The pain itself can be caused by numerous conditions.

II.

Plaintiff appeared before Joel Friedman, ALJ for a hearing on February 8, 2005. Counsel for plaintiff argued that since plaintiff's prior denial of benefits plaintiff had been diagnosed with meralgia parasthetica, and that he was taking very strong pain killers without substantial relief from the pain. Plaintiff testified that he was not able to function because of his constant agonizing pain that he suffers "24/7", and that the prescription pain medication makes him disoriented at times. (R. 44). His pain is in the inner and outer area of his right thigh into his groin area. In addition, his leg is swollen and he has "shooting pains" in his right knee. Plaintiff testified to taking Amitryptyline (neurontin) 3 times a day, Elavil once a day, Oxycontin (a time released version of Oxycodone) twice a day, Gabapentin (neurontin), and Endocet (Percocet). The medications slow him down and make him feel drowsy. (R. 54).

III.

Generally, a claimant is considered disabled under the Social Security Act if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §423(d)(1)(A). A plaintiff will not be considered disabled unless he cannot perform his previous work and is unable, in light of his age, education, and work experience, to engage in any other form of substantial gainful activity existing in the national economy. *Id.* at §423(d)(2)(A). *See Sykes v. Apfel*, 228 F.3d. 259, 262 (3d Cir. 2000); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 118 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *See Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *see* 42 U.S.C. §405(g). The Court is bound by the ALJ's findings of fact if they are supported by substantial evidence in the record. 42 U.S.C. S 405(g); *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson,* 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. A reviewing court will not set a Commissioner's decision aside even if it "would have decided the factual inquiry differently." *Hartranft,* 181 F.3d at 360. But despite the deference due the Commissioner, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales,* 225 F.3d at 316 (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)).

The Social Security Administration has developed a five-step process set forth in the Code of Federal Regulations for evaluating the legitimacy of a plaintiff's disability. 20 C.F.R. §404.1520. In this case, the plaintiff met the first three steps, and the issue was whether plaintiff met step four and five. In step four, the ALJ must consider whether the plaintiff "retains the residual functional capacity (RFC) to perform [his or] her past relevant work." *Id.; see Sykes*, 228 F.3d at 263; 20 C.F.R. §404.1520(d). This step requires the ALJ to do three things: 1) assert specific findings of fact with regard to the plaintiff's RFC; 2) make findings with regard to the physical and mental demands

of the plaintiff's past relevant work; and 3) compare the RFC to the past relevant work, and based on that comparison, determine whether the claimant is capable of performing the past relevant work. *Burnett*, 220 F.3d at 120.

ALJ Friedman found that plaintiff could not perform his past work because plaintiff "would have difficulty doing the prolonged standing and walking required for light work, and is, therefore limited to sedentary work." Since plaintiff's prior work as a food handler was "all performed at the light and medium exertional levels," he could not perform his past relevant work.

In step five of the process, the burden of proof shifts to the Commissioner to determine whether there is any other work in the national economy that the plaintiff can perform. *See* 20 C.F.R. §404.1520(f); *Sykes*, 228 F.3d at 263 (citing *Yuckert*, 482 U.S. 137, 146 (1987)); *Burnett*, 220 F.3d at 118-19; *Plummer*, 186 F.3d at 429; *Doak*, 790 F.2d at 28. In demonstrating there is existing employment in the national economy that the plaintiff can perform, the ALJ utilizes the medical-vocational guidelines (the "grids") from Appendix 2 of the regulations, which consider age, physical ability, education and work experience. 20 C.F.R. §404, Subpt. P, App. 2. The ALJ correctly applied the grid having found that plaintiff was a younger individual (47 years of age) with a high school education, and no transferable past relevant work. In addition, plaintiff was found to have the residual functioning capacity to met all the strength demands required by work at the sedentary level. (SSN Ruling 83-10, 11). ALJ Friedman determined that plaintiff fit squarely within the grid for an individual of his age and education who could perform sedentary work. There is substantial evidence to support that conclusion.

ALJ Friedman also questioned plaintiff with regard to his assertions of constant pain, but found that his testimony was not credible. In his opinion, the ALJ noted:

8

> When asked questions of any sort, the answer was "I'm in constant pain" over and over again. He did not answer any questions directly".
>
> * * *
>
> The undersigned notes that despite the claimant's groans and repeated descriptions of "agony" in answer to every question including how long he could sit, walk, etc., he walked easily into the hearing room and sat for over an hour with no evidence of difficulty.

(Opinion at p. 7)

These observations by the ALJ are consistent with the record wherein plaintiff's credibility is questioned. The ALJ pointed to reports of several doctors including (a) an orthopedic examination on March 22, 2002, wherein plaintiff would not leave "until medical records were changed" to reflect his version of the facts; (b) an exam in November, 2003 in which the orthopedist had the "distinct impression that claimant is grossly exaggerating" his condition; and (c) an evaluation on June 1, 2005 at the East Orange VA where plaintiff complained of "excruciating right sided pain" but the neurologist observed that "claimant's muscle bulk was normal without signs of atrophy on the right." In addition to the credibility issues, there is substantial evidence that plaintiff can perform sedentary work. Such work includes minimal lifting and standing. Claimant's residual functioning capacity test supports this conclusion. It found he could perform sedentary work. In addition, plaintiff takes public transportation, walks, carries groceries and does laundry. All these activities involve some standing, walking and lifting consistent with sedentary work. Outside of plaintiff's complaints of pain, there are few, if any, objective medical findings in the record. Dr. Thierston' noted plaintiff's gait was normal, he did not use a cane and moved from the examination table with ease. Dr. Van Der Sluis observed a "well looking veteran in no acute distress," muscle bulk was

normal without signs of atrophy on the right side and his gait was normal and his stride and posture were very supple and no longer antalgic (R. 684).

     In short, the ALJ's findings are clearly supported by substantial evidence, especially in light of the credibility issues. The final determination of the Commissioner of Social Security is affirmed. The Complaint is dismissed


May 24, 2007                                                            _s/Peter G. Sheridan_
                                                               PETER G. SHERIDAN, U.S.D.J.